MEMORANDUM OF DECISION
This post judgment case was referred to the Regional Family Trial Docket by the Judicial District of New Haven. It consists of the defendant's motion to modify custody dated January 19, 2000 (# 367) and the plaintiff's motion to modify child support and visitation dated February 22, 2000 (# 339). The financial issues were bifurcated and will be heard at a later time. Additional motions heard at this time were: defendant's motions for contempt dated February 13, 2000 (# 336), March 5, 2000 (# 341), March 20, 2000 (# 342), June 27, 2000 (# 351), June 27, 2000 (# 352), July 28, 2000 (# 359), July 28, 2000 (# 360), and plaintiff's motion for contempt dated February 22, 2000 (# 338). These motions were heard over twelve trial days. The parties received testimony from many witnesses including the parties, the Guardian Ad Litem, Attorney Michael Perzin, the former Guardian Ad Litem, Attorney Eliot Nerenberg, the Family Services Evaluator, Allen B. Rubin, and a family psychological evaluator, Dr. Kenneth Robson.
Mr. Brossy appeared pro se and represented himself throughout the trial. Although it was a disastrously poor decision by Mr. Brossy to proceed without representation, it is important to recognize that it is the established policy of the Connecticut courts to be solicitous of pro se litigants and, when it does not interfere with the rights of the other parties, to construe the rules of practice liberally in favor of the pro se party. Connecticut Light Power Co. v. Kluczinsky, 171 Conn. 516,519-20 (1976). Mr. Brossy's lack of legal training did not interfere with the rights of the other parties. On the contrary, although Mr. Brossy was given great latitude in the presentation of his case, he was the only one prejudiced by his pro se presentation.
The parties, Nannette Wright (Mrs. Wright) and Guy Brossy (Mr. Brossy) were divorced on June 16, 1995 after 13 years of marriage. They have 4 children: Victoria, born March 25, 1987, Elizabeth, born September 20, 1988, Caroline, born April 3, 1991, and William, born June 1, 1992.
At the time of the divorce, sole custody of the minor children was awarded to Mrs. Wright subject to Mr. Brossy's rights of reasonable CT Page 1550 visitation to include every other weekend and every other holiday. The primary issue in this case is whether the custody and visitation orders should be modified. The current orders stem from a modification dated November 2, 1998 when the parties reached a comprehensive settlement of all disputed issues just before they were to begin trial of those issues before the Regional Family Trial Docket. The court approved a 25 page stipulation in which the parties agreed to joint custody of the children, primary residence with Mrs. Wright and parental access to the children by Mr. Brossy on alternating weekends plus other times as specified. Both parties now move to modify those orders.
Mr. Brossy's rights of visitation have been the source of intense conflict between the parties since the dissolution. This is a file which rivals in size and acrimony any of the high conflict cases tried in the Regional Family Trial Docket. In summary, Mr. Brossy feels that Mrs. Wright has manipulated the children so as to alienate them from him and to sabotage his visitation rights. Mrs. Wright feels that Mr. Brossy's abusive demeanor and explosive temper have alienated the children from him and have caused the children to be unwilling to visit their father. There have been at least seven investigations of the family by the Department of Children and Families. The police have been called numerous times because of incidents arising out of visitation. The children have expressed to many people on many occasions that they are fearful of their father and do not want to visit him. Mrs. Wright states that she has tried to convince the children to visit their father but has met such powerful resistance from the children that she has not always delivered them for visitation. There have been dozens of motions for contempt filed over the years and many court appearances and hearings. Mrs. Wright has been held in contempt of court at least twice (and possibly a third time depending on how the file is interpreted) for failing to accord visitation rights to Mr. Brossy.
There is no question that both parties sincerely believe that they are acting in the best interests of their children. Each is convinced that the other is a danger to the children and that all of the blame for the present situation lies with the other party. Neither is able to comprehend that each might share some of the responsibility for what is happening to their children. For the reasons set forth in this opinion the court finds that both parties have contributed to the visitation problems. The psychological dynamic between the parties was explained by the expert witnesses and is not that difficult to discern. Mr. Brossy has acted in an angry, abusive maimer toward Mrs. Wright for many years. This has left Mrs. Wright fearful of Mr. Brossy and convinced that he is a danger to the children. Mr. Brossy is a loving but tactless parent who lacks many important parental skills including the ability to control his temper in the stress of trying to handle four young children. Although he is not CT Page 1551 physically dangerous, he is lacking in empathy for the feelings of his children. His emotional outbursts and continued use of corporal punishment, even though not physically harmful, have caused the children to be upset and fearful about their visits. Mr. Brossy has stubbornly refused to stop using physical punishment or get formal therapy for anger management as requested by Mrs. Wright. This has reinforced Mrs. Wright's belief that Mr. Brossy is dangerous and has led her to engage in alienating behaviors which have magnified the children's disinclination to visit their father and to exaggerate Mr. Brossy's behavior, especially his use of physical punishment. There is constant turmoil surrounding visitation which is upsetting to the children, leads to fighting between the parties and continuous court activity.
Mr. Brossy feels that the only solution to this problem is for him to become the sole legal custodian and primary residential parent. Mrs. Wright feels that the only solution to this problem is for her to become the sole legal custodian again and for Mr. Brossy's visitation to be suspended for a period of time while he receives therapy for his anger and abusive behavior. The attorney for the minor children proposes that the children have limited or no contact with their father. The Guardian Ad Litem recommends that the defendant father be given sole legal custody and primary residential custody. The Family Services evaluator recommends that the plaintiff mother have sole legal custody and that the defendant's visitation be suspended for 6 months and that he not be able to initiate any telephone contact with the children or the plaintiff. The family psychological evaluator recommends that the father be given sole legal and physical custody.
Rarely is a court faced with such a disparate array of conflicting requests and recommendations. In order to fashion a proper resolution of the motions before it, the governing legal principles must be restated. In order for this court to modify the custody and visitation orders entered on November 2, 1998, it must find either:
1. That there has been a material change of circumstances since the date of the orders of November 2, 1998 which alters the court's finding of the best interest of the children; or
2. That the orders of November 2, 1998 were not in the best interests of the minor children. Hall v. Hall, 186 Conn. 118, 122 (1982).
Controlling the court's modification, as in all cases involving custody of minor children, is Section 46b-56(b) of the General Statutes. It provides as follows:
 In making or modifying any order with respect to CT Page 1552 custody or visitation, the court shall (1) be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference, . . .
With regard to the issue of custody, the following quotation from the case of Raymond v. Raymond, 165 Conn. 735, 741 (1974) sets forth the rule of law upon the issue of custody:
 Where custody and visitation rights have been affected, a court has the power and the duty to safeguard those rights while recognizing that such interests are subordinate to the welfare of the children. Neither parent's interests with regard to his or her children are a property right nor are they rights which cannot be terminated without his or her consent. A contest relative to custody, such as visitation rights, is not one primarily to determine the rights of the respective parties but rather a determination of the best interests of the child or children. (Citations omitted)
It is important to remember that the court is bound to consider the children's best interests and not what would have been in their best interests at some previous time. O'Neill v. O'Neill, 13 Conn. App. 300,303 (1987). For this reason, the Appellate Court held in the O'Neill case that a custody study which was thirteen months old was stale on the issue of custody and should not have been relied upon by the trial court. Id. at 304. Therefore, care must be taken in using the family psychological evaluations made by Dr. Kenneth Robson in 1997 and 1998. Prior to the orders of November 2, 1998, the court referred the file to Dr. Robson for a full family psychological evaluation. Dr. Robson is a child and adolescent psychiatrist with over 30 years of experience. He estimates that he has prepared over 200 child and family psychological studies and has testified between 30 and 50 times. Dr. Robson completed an 85 page written report on October 10, 1997. He clarified certain points in a 5 page memorandum dated January 1, 1998. On October 26, 1998 he completed a 38 page update to his initial evaluation. The reports prepared by Dr. Robson are exhaustive. In large part, they provided the parties with information used in negotiations leading to the settlement of November 2, 1998. The reports also provided much of the background information utilized by the Family Relations evaluator, Allen Rubin, whose opinion will be discussed later. Although Dr. Robson has had no contact with the family since October 1998, he was called as a witness by Mr. Brossy, and his reports became full exhibits. These reports are stale as evidence of CT Page 1553 present parenting abilities of the parties. Id Dr. Robson did render a current opinion based upon a hypothetical question which asked him to assume that all things had remained the same with the family since his last contact with the family in 1998. Because of the teaching of theO'Neill case and because the children are more than two years older and even more entrenched in their feelings, the court is not able to rely upon Dr. Robson's opinion about the current situation. However, Dr. Robson's reports were relied upon by Alan Rubin, Family Services evaluator, in providing the history of the complex psychological inter relationships of these parties and their children. Mr. Rubin made his own observations and confirmed Dr. Robson's findings. So, Dr. Robson's findings and conclusions will be used by the court for historical purposes and as they are reflected in the current report and testimony of Alan Rubin.
A brief review of the history leading up to the modification of November 2, 1998 is in order. The dissolution was granted on June 16, 1995. Problems with visitation began almost immediately and the court file reflects that both parties began filing post judgment motions within a month after the dissolution. On January 18, 1996 the court declined to hold Mrs.Wright in contempt of court but issued a warning that a failure to comply with future visitation would result in the court revisiting Mr. Brossy's motion for contempt. During this time the attorney for the minor children was playing an active role attempting to act as a mediator of the visitation disputes which were ongoing. In October 1996 the attorney for the minor children, Jean Welty, moved that the court appoint a Guardian Ad Litem for the four minor children. The court appointed Attorney Eliot Nerenberg as Guardian Ad Litem. In November 1996 the attorney for the minor children moved the court to order a psychological study of the relationships of the parties and their children. On January 27, 1997 the court with the agreement of the parties ordered a family psychological study by Dr. Kenneth Robson.
Mrs. Wright was first held in contempt of court on September 23, 1997 for wilful disobedience of the court's previous visitation orders. As a remedy, the court ordered make-up visitation and the payment of fees to the Guardian Ad Litem and the attorney for the minor children. On July 28, 1998 the court, in response to Mr. Brossy's motion for contempt, issued an order that Mrs. Wright comply with a visitation schedule set by the court. It is not clear from the file if Mrs. Wright was held in contempt of court but she was ordered as follows:
 The court orders the plaintiff, Nanette Brossy (Wright), NOT to contact, directly or through others, the defendant's employer, and public agencies (including the police department), or public in CT Page 1554 general to disparage or criticize the defendant, Guy Brossy, to them in any manner. If the plaintiff has any concerns regarding the minor children, she is to report it to Attorney E. Nerenberg, Guardian Ad Litem for the minor children.
Prior to November 2, 1998 there were two full investigations of the family made by the Department of Children and Families ("DCF"). The first was made after January 24, 1997 when Elizabeth's teacher at school reported that Elizabeth had said that she had been hit by her father. The file was closed in April 1997 without any substantiation of abuse or neglect. On June 18, 1998 the Simsbury Police contacted DCF as a result of call from Caroline's soccer coach reporting that Caroline told him that her father had hit her with his hand and with a crutch. DCF never substantiated any abuse by Mr. Brossy. However, they did accept the case for services after finding neglect against both parents as a result of their putting the children in the middle of their custody battle. Included within this investigation were two subsequent incidents: one occurred in August 1998 when Mr. Brossy allegedly struck Caroline with the back of his hand at A.C. Peterson restaurant. The second took place on or about October 12, 1998 when Mr. Brossy broke up a fight between Caroline and William during a visitation. Mr. Brossy allegedly tossed William across the room so that he tore his clothes and suffered rug burns. This second file was closed on October 29, 1998 with DCF unable to substantiate any allegations of abuse against Mr. Brossy.
The conflict between the parties intensified after Mrs. Wright married David Wright in August 1996. In March 1997 Mr. and Mrs. Wright brought Elizabeth, Caroline and William to Mr. Brossy's home in New Canaan for visitation. Elizabeth refused to get out of the car. So, Mr. Wright dragged her out of the car and was dragging her toward Mr. Brossy's house when Mr. Brossy came out of the house and threatened to call the police if Mr. Wright did not stop dragging Elizabeth by the arm. Mr. Wright then let go of Elizabeth who ran off to a neighbor's house. Mr. and Mrs. Wright drove off. Elizabeth came back shortly and calmed down. The three children had their dinner and went to bed. Later that evening, three New Canaan Police cars drove up to Mr. Brossy's house with Mr. and Mrs. Wright who had reported to the police that the three children were in danger with Mr. Brossy. After the police came into Mr. Brossy's home and found that the children were in their beds, they left without taking any action.
The next weekend, Mr. Brossy was returning Caroline to the Wright home following a visitation when they both started to play basketball in the Wright driveway. Mr. Wright came out of the house and told Mr. Brossy that he was not welcome on his property and that he would call the police CT Page 1555 if he did not leave.
During the fall 1997 soccer season, Mr. Brossy and Mrs. Wright had a confrontation at a children's game in Simsbury. Mr. Wright came over to support his wife. Mr. Brossy told Mr. Wright, in front of one or more of the children, that he would punch Mr. Wright in the face if he came any closer. The next day, when Mr. Drossy returned the children from visitation, Mr. Wright had the Simsbury Police waiting at the house for him. No arrests were made.
In May of 1998 Mr. Brossy attempted to talk to Mr. Wright about the ongoing visitation problems. Rather than talk to Mr. Drossy, Mr. Wright hung up whenever Mr. Drossy would call and refused to return phone messages. Rather than assuming that Mr. Wright did not want to talk to him, Mr. Brossy kept calling. On May 22, 1998 Mr. Wright wrote to the personnel office of the conglomerate which owns both of their employers and complained that Mr. Brossy was using company time to harass him and his wife. In the letter, Mr. Wright also stated: "The Simsbury police department has an open file on harassment against Brossy." Mr. Brossy stopped calling Mr. Wright. But he continued to call and fax Mrs. Wright about almost constant problems with visitation. On June 26, 1998 Mrs. Wright wrote to Mr. Brossy's employer to complain that Mr. Drossy was harassing her by telephone and fax from his office.
It was against this background of motions for contempt, police intervention, and DCF complaints that the parties entered the stipulation of November 2, 1998 to settle all of their outstanding disputes. It would be difficult to argue that there has been a material change of circumstances since November 2, 1998. The situation is substantially the same as it has been since November 2, 1998. The parties still can not communicate, there have been five new investigations by DCF, the police have been involved on at least two occasions, and the children continue to express extreme reluctance to visit their father. It is clear that the orders of November 2, 1998 did not improve relations between the parties. Those orders were issued after 3 years of turmoil which led to a referral to the Regional Family Trial Docket. Through the efforts of court-appointed special masters, the Guardian Ad Litem, and the attorney for the minor children, the parties became convinced that their differences could be reduced by modifying the parenting plan to one of joint custody supported by dispute resolution mechanisms including arbitration. The court approved these changes without testimony. Everyone was optimistic that the changes in the parenting plan, including joint custody, would be a change for the better. It has not been proven to be true. The provision in the agreement concerning arbitration of disputes was never used by the parties. Nothing has improved since the agreement was reached. The court is forced to find that the November 2, 1998 CT Page 1556 stipulation approved by the court was not in the best interests of the minor children and that a modification of the parenting plan would be in the best interests of the children.
Some of the major happenings since November 2, 1998 must be discussed. In November 1999 DCF reopened their file on the Brossy family. It appears that this action was taken after a report was made to DCF by Jean Long, a therapist who was treating the children at the time. A full investigation was done, including home visits at both homes. All of the children were interviewed about allegations that Mr. Brossy's wife, Meg, had tried to choke Victoria. All of the children expressed reluctance to visit their father because of various things. In summary, they claimed that he was mean to them, yelled at them and hit them. As to the specific allegation against Meg Brossy, it became clear that she had not tried to choke Victoria. She had put her hands on Victoria's shoulders in an attempt to calm her down during a bout of hysterical crying. DCF closed its file without any substantiation of abuse. However, the investigation is extremely troubling for several reasons, all of which reflect badly on one parent or the other. First, it must be taken seriously that this complaint was made by a therapist who was seeing the children on a regular basis. Ms. Long had been accepted by both parties as an appropriate therapist to treat the children. Therapy for the children was an important component of the November 2, 1998 agreement. That she believed enough of what she was hearing from the children to make a report to DCF can not be discounted totally even though DCF could not substantiate physical abuse. Second, Mr. Brossy's reaction to the complaint was to write to Jean Long revoking his permission for the children to continue to see her. He states his opinion that she simply did not understand the real issues and that her actions were irresponsible. It is a characteristic of both parents that if someone disagrees with them, they attack the other person as unable to understand what is really happening. Third, the report discloses that Mrs. Wright and the children had worked out a secret "alert code" which could be used by the children to signal to their mother that they were in danger at the hands of their father (they were to use the words "Mom" and "flower" in the same sentence). Fourth, the report reveals that Mrs. Wright actually believed and repeated to the investigator a story that has no basis in any of the evidence of this case. That story is that on a recent weekend visit, Mr. Brossy had grabbed William by the arm and twisted it so he went to the ground and then laughed when William cried. Mrs. Wright claimed that Mr. Brossy imitated William crying and did it again to him. That Mrs. Wright apparently felt that Mr. Brossy was capable of such a deliberate act of cruelty to a young child indicates how fearful Mrs. Wright is of Mr. Brossy and the lengths to which she is willing to go to discredit him. CT Page 1557
Apparently, this story of alleged cruelty to William was the basis for another separate complaint to DCF. On December 7, 1999 the file was reopened again based upon a call from a friend of David Wright's who alleged that Mr. Brossy had twisted William's arm backwards and put his knee in his back and pushed him backwards. So, William was interviewed again by an investigator on December 8, 1999 even though he had just been interviewed on November 26, 1999. William told the investigator about several different times when his father had disciplined him with a swat on the butt but never said anything about having his arm twisted back and being kneed in the back. This file was closed without substantiation of abuse. This incident, like the last is troubling because it shows this young boy, age 7 at the time, being put in the position of being asked to say bad things about his Dad to persons in authority who he did not know. It also reflects how exaggerated the stories of physical abuse have become. Finally, it reflects that Mrs. Wright was upset with DCF for failing to take action against Mr. Brossy. Like Mr. Brossy, Mrs. Wright never accepts anyone's opinion which does not correspond to her own.
The next DCF file resulted from a Hotline phone call on December 7, 1999 from a coordinator at a facility known as Interval House that Mr. Brossy continues to abuse the children physically and emotionally. This coordinator had spoken with Mr. and Mrs. Wright and was trying to help them. The complaint seems to be a rehash of previous charges but focused on the claim that the two older children, Victoria and Elizabeth were locked in their rooms and forced to write letters of apology to Jean Long for reporting that Meg Brossy had chocked Victoria. Again, no abuse was found. As with the other complaints, it indicates the extreme pressure the children were under at that time to conclude that there father is a dangerous man.
After this flurry of complaints in December 1999, the next complaint did not come in to DCF until February 3, 2000. This complaint came from Caroline's teacher who reported that Caroline had told her that all of the children were being hit by their father and thrown against the wall. All of the children were interviewed again and they gave the familiar litany of complaints about their father being mean to them, yelling and hitting them. No physical abuse was substantiated. DCF concluded that the parents have different parenting styles in that Mr. Brossy uses physical discipline while Mrs. Wright does not.
In late 1999 Mr. Brossy filed a motion with the court seeking intervention in establishing a visitation schedule for the year 2000. The parties had been unable to do so on their own. By order of the court a visitation schedule was established for 2000 for specific weekend and holiday visitation. CT Page 1558
There was another police intervention during a visitation on March 17, 2000. Mrs. Wright arranged to have Caroline and William delivered for visitation that day by a man named Andre Riendeau, the youth pastor of the church attended by the Wright family in Simsbury. Mrs. Wright and her husband had gone to New Hampshire for the weekend. During the trip from Simsbury, Caroline cried hysterically in the car and stated that she did not want to visit her father. When Mr. Riendeau pulled into the Brossy driveway, William got out of the car and went into the house. Caroline locked herself in the car and refused to get out. Mr. Brossy came out to speak with Mr. Riendeau and was verbally abusive to him. Neither was able to get Caroline out of the car. Caroline was crying hysterically. After awhile, Mr. Brossy went back inside the house to get a coat. Mr. Riendeau thought that Mr. Brossy had given up on trying to get Caroline out of the car. Therefore, Mr. Riendeau got back into the car and drove away, intending to return to Simsbury. When Mr. Brossy came back outside and found Mr. Riendeau gone, he got into his car and gave chase. He stopped Mr. Riendeau's car on the entrance to the Merritt Parkway. He got out of his car and walked back to Mr. Riendeau's car to accuse him of kidnaping his daughter. Caroline was still crying hysterically and refusing to go with her father. Eventually Mr. Brossy got back into his car and began to drive to his house thinking that Mr. Riendeau would follow him. Mr. Riendeau, who was confused as to Mr. Brossy's intentions, decided to return to Simsbury. When Mr. Riendeau did not return to the Brossy home, Mr. Brossy called both the Simsbury Police and the New Canaan Police to report that his daughter had been kidnaped. Neither police department ever took any action on these complaints as Mr. Riendeau returned Caroline safely to her mother's home in Simsbury. Mr. Brossy began trying to call Mr. Riendeau at his church and at his home. Mr. Riendeau refused to talk to Mr. Brossy and eventually made a telephone harassment complaint to the Bloomfield Police Department. No action was taken.
As a result of Mrs. Wright's failure to accord Mr. Brossy his visitation rights in the past several weeks, the court held Mrs: Wright in contempt of court on March 30, 2000. The order of the court states that the court does not incarcerate Mrs. Wright as requested by Mr. Brossy but orders Mrs. Wright to comply with the court orders.
The Department of Children and Families reopened the Brossy file on April 3, 2000 after a bizarre home visitation made by the Family Relations Evaluator, Allen Rubin, on March 31, 2000. As part of his investigation in preparation for writing his report, Mr. Rubin made a home visit to Mr. Brossy's home in New Canaan. It was a Friday night and the children were scheduled to spend the weekend with their father. Mr. Rubin made arrangements to be at the Brossy home when the children were delivered for visitation by their mother and to stay for several hours to observe the visitation and the interaction of the children with their father. The CT Page 1559 children came into the house in an agitated state. The two older girls told Mr. Rubin that they intended to leave with their mother after they talked with him. Mr. Rubin explained that he was not there to talk to them but to observe the visitation. The girls became more agitated and called their mother on her cell phone. Mrs. Wright, in a disastrously bad exercise of judgment, came back to the house. The girls began to remove personal property from the house and to bring it to their mother's car. Mr. Brossy attempted to stop the children from taking things to Mrs. Wright's car. Mr. Brossy grabbed Elizabeth by the arm as she was running toward her mother's car with something in her hands. At that point, Elizabeth, and possibly more of the children, ran away. The other children eventually returned to the house but Elizabeth ended up at a neighbor's house. The neighbor called the New Canaan Police Department who came to interview Elizabeth. When a police officer came to the neighbor's house, Mr. Brossy was already there. Elizabeth was crying hysterically and stating that she did not want to go with her father. Mr. Brossy then became extremely belligerent with the police office and began to act irrationally. He began to scream and claim police brutality. Eventually, Mr. Brossy and Elizabeth went to the New Canaan Police Department along with Mrs. Wright and Mr. Rubin. Elizabeth restated that she did not want to go with her father and would run away again if she were forced to go with him. Finally, Elizabeth went home with Mrs. Wright. Mr. Brossy was extricated from an argument with the police by Mr. Rubin and was allowed to return to his home. The police closed their file after Mr. Rubin convinced them that Mr. Brossy had done nothing abusive to Elizabeth.
Mrs. Wright's participation in the bizarre happenings of March 31, 2000 is of great concern. First, it is clear that at least some of the problems of that evening could have been avoided if she had simply gone back to Simsbury after dropping the children for visitation. The children had been given the impression by their mother that they would be able to leave the visitation that evening. Mrs. Wright should not have given the children the idea that leaving might have been an option. Mr. Brossy had visitation scheduled for the entire weekend. This visitation had been established by the court in the visitation schedule dated February 15, 2000. Somehow Mrs. Wright has permitted the children to think she will allow them to disobey the visitation orders of the court. Second, Mrs. Wright testified at trial that during the evening, before Elizabeth ran away, she saw Mr. Brossy not only grab Elizabeth by the arm as she was attempting to bring something to Mrs. Wright's car, but to hit Elizabeth in the back with his closed fist. This is an extremely serious allegation. It is the only allegation of physical abuse of the children by Mr. Brossy which was allegedly seen by an adult. The problem is that Mrs. Wright did not tell the police, Mr. Rubin, the Guardian Ad Litem or anyone else in authority about it until she testified at trial. Nor is CT Page 1560 there any evidence that Elizabeth ever alleged that her father hit her in the back with his closed fist. The only allegation made by Elizabeth that night was that her father hurt her wrist when he grabbed her. The court is forced to conclude that Mr. Brossy did not hit his daughter with his fist that evening. He should not have grabbed his daughter but it certainly did not rise to the level of abuse.
These events of March 31, 2000 led to another reopening of the DCF file. Based upon the input from Mr. Rubin, the file was simply referred to the Family Relations Office on the ground that there were no abusive acts by Mr. Brossy who was attempting to gain control of a chaotic situation. There has been no subsequent DCF action.
The visitation schedule established in the February 15, 2000 order of the court gave Mr. Brossy visitation with all of the children during the April school vacation, April 14, 2000 to April 23, 2000. Mr. Brossy planned a trip to the Grand Canyon with the children and purchased airline tickets for everyone. Just before the trip was to begin, Victoria and Elizabeth objected to going. Mrs. Wright did not deliver them to Mr. Brossy to begin the trip. Therefore Mr. Brossy had visitation with Caroline and William during that trip to the Grand Canyon but not with Victoria and Elizabeth. This was in direct violation of the order of the court and happened because Mrs. Wright did not fulfill her duty as the primary custodial parent of ensuring that the children are delivered to Mr. Brossy for visitation.
Through May, June, July and August of 2000 the only visitations Mr. Brossy had with his children were one visit in May and one in June with Caroline and William only. Although there are various reasons given for these missed visitations, in general, Mrs. Wright claims that the children were unwilling to visit their father. Particularly troubling is the summer vacation period which the court had ordered for August 5, 2000 through August 27, 2000. Mr. Brossy had planned a family vacation with the children at a cottage in Michigan. On August 3, 2000 the parties appeared in court in New Haven. At that time Mr. Brossy attempted to have Mrs. Wright held in contempt of court prospectively if she did not produce the children for the vacation to begin in two days. Mrs. Wright attempted to have the court modify the scheduled visitation. The court refused to grant the relief requested by either party. Instead, the court told both parties in no uncertain terms that it expected the parties to comply with the established visitation schedule or risk the contempt powers of the court. On August 5, 2000, Mrs. Wright called Mr. Brossy to say that the children were resisting getting in the car to be delivered to New Canaan. Mrs. Wright attempted to engage in negotiations for a shorter vacation. The end result was that the children never spent one day of the vacation with their father. This is inexcusable. The court is CT Page 1561 not persuaded by the evidence that Mrs. Wright was unable to deliver the children to Mr. Brossy. Again, this vacation had been established specifically by the court. It is Mrs. Wright's responsibility as the residential parent to teach the children about respect for the law. She is falling in this important parental duty. Mrs. Wright never should have disobeyed this order. She should have delivered the children to Mr. Brassy's house in New Canaan at the appropriate time.
The next scheduled visitation was September 15-17, 2000. This was the weekend before the Special Masters pretrial scheduled in this court. All of the children appeared for that visitation and it took place without major incident. However, the weekend of October 13-15, 2000 saw another disruption in visitation. Caroline and William appeared in New Canaan as scheduled on Friday evening. On Saturday morning Mr. Brossy brought the two children back to Simsbury so that they could play in their soccer games. After the second soccer game, Caroline became hysterical when she saw her mother and clutched onto her for dear life. When Mr. Brossy approached, Caroline and William ran away into the woods and could not be found by their father. Mr. Brossy was forced to go back to New Canaan without the children. Mr. Brossy never found out what happened and Mrs. Wright never explained.
All visitations which were scheduled during the trial of this case took place as scheduled. It is telling that while under the uncertainty of this trial, the parties have managed to ensure that visitations take place as scheduled by the court. It is the conclusion of this court that when both parties have put their minds to the task they have managed to make the visitations take place without court, police or DCF intervention. The question, is could they continue to make visitations take place in the future if each thought they truly had something to lose? The conclusion of this court is that they could.
Mr. Brossy is a 43 year old man who is in excellent health. He has remarried and has a young son, Phillip, age 2. He is employed in New York City in a managerial position at Solomon, Smith, Barney. Mr. Brossy and his wife, Meg, live in New Canaan. At the time of her testimony, Mrs. Brossy was employed in New York City on a schedule which allowed her to work from home some days during the week. In his closing argument Mr. Brossy stated that Meg Brossy was no longer employed. Mr. and Mrs. Brossy employ a nanny to take care of their son when they are working.
A major issue in this case is whether Mr. Brossy's explosive temper in the exercise of his rights of visitation is the primary cause of the children's disaffection from him or whether it is secondary in importance to Mrs. Wright's alienating behavior. Mr. Brossy does not even recognize that he has a serious temper problem. He seems to think that he merely CT Page 1562 has a loud voice and is a strict disciplinarian. This is ridiculous. Mr. Brossy's outbursts during the trial were sufficient to demonstrate that he has an explosive temper which can erupt when he is under stress. This loss of temper manifests itself as extreme anger accompanied by a loud voice, a red face, irrational words, and intimidating behavior. The testimony of several witnesses support the courts's own observation of Mr. Brossy's behavior. Dr. Robson and Alan Rubin both found that Mr. Rubin has a serious problem with his temper. Both recommended that Mr. Brossy engage in anger management therapy. Judge Shortall in his January 3, 1995 Memorandum of Decision on a pendente lite motion concluded that Mr. Brossy was responsible for much of the difficulty surrounding the visits with his children and that significant changes were required in his behavior if a successful visitation schedule was to be maintained. Therefore he ordered that Mr. Brossy refrain completely from displays of anger toward the plaintiff or any persons accompanying the children when the children are transferred. Judge Shortall stated further:
 The court had ample opportunity to observe the demeanor of the parties to this action at the hearing on December 21, 1994. Based on those observations, the court strongly suggests to the defendant that he retain counsel who can advise him as to his obligations and rights in this matter and as to the proper procedures for him to employ. Further, the court suggests that the defendant enter into a course of individual counseling to assist him in dealing with the obvious stress created by the situation in which he finds himself. While these are not orders of the court, the court believes that the best interests of the children would be furthered by the defendant's pursuit of these courses of action.
Mr. Brossy did not take Judge Shortall's advice regarding representation or counseling. Judge Shortall only had one day to observe Mr. Brossy's demeanor. This court had twelve days. Mr. Brossy did not take Dr. Robson's advice, nor did he take Mr. Rubin's advice. It is significant that Mr. Rubin saw Mr. Brossy's anger on display during the aborted home visitation of March 31, 2000. It is an indication of Mr. Brossy's total lack of understanding of the importance of this issue that he has never engaged in formal anger management therapy. The court does not give any weight to the unsubstantiated claims of Mr. Brossy that he has had therapy with someone named Boris Zubuk. Mr. Brossy was unable to give the credentials of this person or give any information about the nature of the therapy. Mr. Brossy's opinion is that he does not have an anger problem, that he does not need therapy and that, at most, what he might need is a Dale Carnegie course. He has known for at least six years CT Page 1563 that anger management has been the main concern to Mrs. Wright and his children. It is incredible that a man of Mr. Brossy's intelligence could be so blind to such a significant fault. It is clear that his temper, accompanied by abusive behavior, was the primary factor in the breakup of the marriage to Mrs. Wright and has been the primary issue surrounding visitation ever since the divorce. Children exposed to such a violent temper would be frightened and, in the long term, disinclined to want to spend time with their father.
Finally, the stipulation of the parties incorporated in the November 2, 1998 modification of the court provided:
 "In addition, each party shall participate on psychotherapy to explore the issues identified in Dr. Robson's report and such other matters as deemed appropriate by their personal therapist."
Mrs. Wright has complied with this order. Mr. Brossy has violated it.
Whether Mr. Brossy uses physical force in disciplining the children has been raised by Mrs. Wright for many years. The stipulation of the parties incorporated in the November 2, 1998 modification of the court merely provides that physical punishment or the use of physical force shall not occur. The children and Mrs. Wright constantly complain that Mr. Brossy "hits them and yells at them." Mr. Brossy has continued to use physical force since November 2, 1998 although there is no credible evidence that any of Mr. Brossy's actions rise to the level of "physical abuse." But, the children are all too old for there to be any physical force used in discipline.
Even though Mr. Brossy made a mess of the trial of his case, he told the court in final argument that he was glad that he had not engaged an attorney because it allowed the court to truly see him "as he is." If that was his purpose, he succeeded. Mr. Brossy demonstrates an excessive pride in the macho image he tries to project. In accord with the description of one of the witnesses, he likes to think of himself as a "bull in a china shop." In fact, he is closer to a bully. It is time that he grows up, takes responsibility for his actions, and begins to listen to advice from those who have tried to help him. He has the intelligence and ability to regain the respect and affection of his children but he must begin to listen. He has a legal obligation to get therapy for his anger which dates back to his stipulation on November 2, 1998. He must comply with that obligation. He must stop using any form of physical force with his children. He must begin to listen to the concerns of his children rather than simply assuming that they are pawns of Mrs. Wright. CT Page 1564
Mrs. Wright is a 43 year old woman in excellent health. She has been remarried for over four years to a man named, David Wright, who has custody of two minor children from a previous marriage. They all live in Simsbury where the children attend public schools. Mr. Wright is employed by The Traveler's in Hartford. Mrs. Wright, who has a college education, has not been employed outside the home in several years.
A major issue in this case is whether Mrs. Wright's behavior has alienated the children from their father. There is ample evidence that Mrs. Wright has alienated the children in conscious and unconscious ways. Mrs. Wright views Mr. Brossy as a dangerous and negative influence on the lives of the children. Her behaviors and perceptions of him come, in part, from his abusive behavior during and after the marriage and, in part, from her earlier life experiences with her mother and stepfather. Mrs. Wright has gone to great lengths.to implicate Mr. Brossy in abusive behaviors toward the children. The police interventions and the DCF interventions, all of which were commenced, encouraged or sanctioned by Mrs. Wright, have all reinforced in the children the idea that their father is a dangerous man. The children know that their mother is fearful of Mr. Brossy. When the children voice alarm, distress and animosity toward their father they are conforming to maternal needs and expectations. The behavior of Mrs. Wright has convinced the children that Mrs. Wright is the "good" parent and Mr. Brossy is the "bad" parent. By resisting visitations, the children are, in part, fulfilling a need they feel to protect and please their mother.
Mrs. Wright must recognize that she is the most important teacher that the children will ever have. They love and respect her. They will follow her teaching if she truly has her heart in it. She claims to encourage the children to attend and enjoy visitation with their father. But, her record belies her claims. She has failed to teach the children respect for their father and respect for the orders of the court. She is equally responsible for the distress experienced by the children.
The role played by Mrs. Wright in alienating the children from their father has been amplified by her husband, David Wright. Mrs. Wright is convinced that all of the blame for the children's unwillingness to visit their father lies with Mr. Brossy. Mr. Wright has become involved in the dispute between the parties and has encouraged his wife to ignore the evidence which points to the participation of Mr. Wright in the problem. During his testimony he promised the court that there would be evidence establishing that DCF had substantiated reports of abuse against Mr. Brossy on three occasions. There are none. He wrote to Mr. Brossy's employer as previously mentioned and, on February 14, 2000 wrote to Robert Heagney of the Connecticut House of Representatives making several unsubstantiated allegations about the situation. Mr. Wright claimed that CT Page 1565 neither the court system nor DCF was acting to protect the children from their father. Finally, Mr. Wright continues to let some or all of the children call him "Dad" while they call their father "Guy." This is a violation of the stipulation of the parties incorporated in the November 2, 1998 modification. Overall, Mr. Wright has made a bad situation worse.
Victoria Brossy, the oldest child, is 13 years of age and will turn 14 in less than 3 months. She is in the eighth grade and is doing well in school. She plays the saxophone, is interested in dramatics, takes karate lessons and plays soccer. She is described by both parents as intelligent, articulate and opinionated. She can be stubborn and defiant, much like her father. Her Guardian Ad Litem feels that she is more mature than the average child of her age. It is clear that Victoria is of sufficient age and is capable of forming an intelligent preference about custody and visitation. Section 46b-56(b) requires that the court give consideration to Victoria's wishes.
Victoria's wishes were expressed through the testimony of several witnesses. The Guardian Ad Litem met with Victoria the day before the trial began. She expressed her wish to have no contact with her father. The proposed orders submitted by the attorney for the minor children support that wish by requesting that the court order limited or no contact between Victoria and her father. Victoria's sentiments have been consistent for several years. They were essentially the same in 1997 and 1998 when Dr. Robson did his studies. Victoria's resistance to visitation with her father goes back at least 6 years and is reflected in an early order in this case by Judge Shortall dated January 3, 1995 which stated:
 "With respect to the child Victoria, the plaintiff is to use her best efforts to have Victoria participate in visitation with the defendant, short of physically forcing her to do so."
The Guardian Ad Litem questions whether Victoria's stated wishes can be considered to be her true feelings in light of the claims of alienation on the part of Mrs. Wright. But, the court has decided to give Victoria's wishes significant weight.' It is important that Victoria know that the court has heard her concerns. She is not old enough or mature enough to have complete say in this matter, but her stated wishes have been heard and play a significant role in the decision of this court.
The next child, Elizabeth, is 12 years old and is in the seventh grade. She plays several instruments, plays soccer and lacrosse, takes karate lessons and is in a jazz dance class. She is a good student but could do better. She is described by both parents as being less vocal CT Page 1566 than her older sister. She is a peacemaker who has a good sense of justice.
Elizabeth has seen a counselor at school on a regular basis. She has had trouble falling asleep, and, about a year ago, reported suicidal thoughts. During the past school year she was absent and tardy at school more that her sisters and brother. Recently she has been described as being happier than in the last school year. Elizabeth's wishes are the same as Victoria's. Because she is younger and less mature than Victoria, her wishes will be given less weight.
Caroline, age 9, is in the fourth grade. She is doing well in school but has had problems with social interactions with her classmates. She is described as enthusiastic but headstrong. She plays soccer in the spring and fall and is in the Girl Scouts. William, age 8, is in the third grade. He has had some academic and behavioral problems. He is receiving remedial assistance on basic skills and has been disciplined for his behavior. He plays soccer, hockey and baseball. Caroline and William have also expressed the wish that they not visit with their father. Because of their ages and relative immaturity their wishes will be given less weight than the wishes of their siblings.
There is unanimous agreement from everyone involved in this case that the children should not be divided when custody is established. This makes sense. The children are a close knit group. They have come to rely on each other for comfort and support in the ordeal which their parents have put them through. They have been let down by their parents but they have each other. The children should not be separated from their siblings.
Because she is the eldest child and because of her dominating and defiant personality, Victoria exerts a great influence over the actions of her siblings. If she is accepting of a particular custody arrangement, the chances are that the other children will become accepting. On the other hand, if Victoria is defiant about a particular custody arrangement, it is likely that the other children will be defiant as well.
In considering the best interests of the children there are many factors which should be considered. See, Rudolewicz v. Rudolewicz, 12 CLT No. 39, p. 664, Oct. 6, 1986 (Super.Ct. Hartford-New Britain 1986) for a complete list of the various factors. Many of these factors reflect poorly on Mrs. Wright. of special concern to the court are the following two considerations.
1. Character of the parent. CT Page 1567
It is important for the court to look at the character of the parents by reason of wilful disobedience of court orders. Hall v. Hall,186 Conn. 118, 124 (1982). This factor weighs heavily against Mrs. Wright. Her record in obeying court orders is abysmal. She has been held in contempt of court at least twice. She has had other occasions when she might have been held in contempt of court but escaped through the leniency of the court. She has continued to defy the orders of the court including the failure to produce the children for summer vacation with their father in August 2000, within days after the court had reaffirmed the order for three weeks of visitation with Mr. Brossy. Mrs. Wright always claims that the children have resisted visitation and that she has been unable to convince them to visit. This is not a defensible position. As has been shown by the evidence, Mrs. Wright has an excellent relationship with the children. In all other respects they listen to their mother and obey her orders and suggestions. It is not credible that she has been unable to teach them the obligation to obey court orders. The conclusion reached is that Mrs. Wright has not been motivated to obey the visitation orders of the court. She could produce the children for visitation if she wanted. The truth is that she does not feel that the children should be visiting their father. She feels that he is much too dangerous. The children have learned that they can get approval from their mother by exaggerating the actions of their father. Their mother believes these exaggerations even when they are shown to have only a kernel of truth. Then, Mrs. Wright feels justified in disobeying the orders of the court. This reflects poorly on the character of Mrs. Wright even though she may sincerely believe the stories told by the children.
2. Willingness to facilitate visitation.
An important factor in any custody case is the willingness of the parents to facilitate visitation with the other parent. Seymour v.Seymour, 180 Conn. 705, 713 (1980). Mrs. Wright has shown no willingness to facilitate visitation with Mr. Brossy. She says the right things about wanting the children to visit with their father but her unreasoning fear of Mr. Brossy prevents her from facilitating visitation. On the other hand, there is no concern that Mr. Brossy would facilitate visitation with Mrs. Wright.
There are several factors which reflect poorly on Mr. Brossy. These factors are discussed below.
1. Parenting skills and relationship with the children.
It is essential to inquire into each person's parenting skills as well as his or her relationship with the children. Cappetta v. Cappetta, CT Page 1568196 Conn. 10, 17 (1985). There is sharp contrast between the parties in this area. Mrs. Wright has a close, warm and loving relationship with all of the children. She has raised them herself on a daily basis since their birth. In all respects other than teaching her children about visitation, she has demonstrated excellent parenting skills. With respect to visitation she has failed to teach the children about respect for their father and for the orders of the court. Mrs. Wright is blind to this failure.
Mr. Brossy has demonstrated a lack of parenting skills in nearly all areas and has a negative relationship with all of the children. The court is convinced that Mr. Brossy does not have the parenting skills to be a daily parent for four children of the ages of these. of most concern is his relationship with Victoria. She seems to have no respect for her own father at he present time. She has expressed her displeasure on many occasions over several years with the way in which she and her siblings are treated by Mr. Brossy. Specifically, her complaints deal with Mr. Brossy's anger and with his use of physical punishment. Rather than listen to his daughter and modify his behavior, Mr. Brossy has placed all of the blame for Victoria's attitude on Mrs. Wright. He has not shown that he is able to find a way to communicate with Victoria or to handle the everyday problems of a young woman. It is inconceivable that this court could order Victoria's residential custody changed to Mr. Brossy without great upset to Victoria — even greater than she has been experiencing. Her attitude is so hardened and ingrained that it is hard to imagine what would happen if she were turned over to the person whom she has come to view as her abuser and whom she does not even want to visit. The same could be said about Elizabeth. Although Caroline and William are younger and, presumably, less fixed in their alienation from their father, they will become just as distanced unless things change.
2. Stability of environment.
One factor which is extremely important in considering whether to change the custody of children is whether the children are living in a familiar and stable environment. Ridgeway v. Ridgeway, 180 Conn. 533, 541
(1980). The evidence is clear that the children are living in a familiar and stable environment. The children are doing reasonably well in the Simsbury Public Schools, they are all involved in a wide variety of extracurricular activities. Victoria and Elizabeth are active members of the youth group at the church attended by the Wright family. The plan is for Victoria to attend Simsbury High School in the fall. Elizabeth will begin there next year. Uprooting the children from this setting would be extremely disruptive.
In attempting to weigh the various relevant factors, the court is CT Page 1569 mindful of the advice given by the experts. Underlying Allen Rubin's recommendations is the opinion of Dr. Robson that in 1998 he felt that the psychological health of the children was in danger from the manipulative behavior of Mrs. Wright. He felt that the children were growing up with all of their negative feelings toward their mother split off and directed toward their father. This scenario of a good parent and a bad parent is harmful to the children. This scenario seems to be even more intense than when Dr. Robson last had any contact with the family over two years ago. The Guardian Ad Litem, Attorney Perzin, who has performed his duties admirably under great pressure from both parties, testified that he relied upon Dr. Robson's work to recommend that the physical custody of the children be changed to Mr. Brossy. On the other hand, the Family Relations Evaluator, Mr. Rubin, who also agreed with Dr. Robson's findings, came to the opposite recommendation. He feels that the two oldest children are so adamant in their refusal to even see their father, forcing them to move there would be counterproductive. The court agrees with Mr. Rubin on this point. Because of the age and maturity of the two older children, they will not be forced to live primarily with Mr. Brossy. The two younger children could be changed without the kind of upset which would occur with changing the older children, but the court has decided not to change their physical custody either. Primarily this is because there are such doubts about the ability of Mr. Brossy to perform the daily tasks of being a parent and because all parties are in agreement that the children should not be split up.
This leaves the question of what this court can do to further the best interests of the children. It is apparent that the options all have major problems. Mr. Rubin never gave serious consideration to transferring physical custody to Mr. Brossy because he had witnessed firsthand the interaction of Mr. Brossy and his children at the ill-fated home visit. He simply felt that Victoria and Elizabeth would not permit their custody to be changed without running away. The practical considerations of trying to impose such a drastic change on children of their ages is a major concern. This court has long experience in attempting to enforce mere visitation orders without much success. Attempting to enforce a change in physical custody would be exponentially more difficult. Mr. Rubin's solution was to recommend that Mr. Brossy's visitation rights be suspended for six months to allow the children an opportunity to deal with their mother, her positive and negative aspects, without the negative focus being on the father. Mr. Rubin felt that a further assessment of the situation after it has calmed down may provide a real opportunity to heal and restore the children's relationship with their father. Mr. Rubin made this recommendation even though he was aware that it rewards Mrs. Wright for behavior that is reprehensible. The court will not adopt Mr. Rubin's recommendation because it would likely lead to the permanent amputation of Mr. Brossy from the lives of his children. Mr. CT Page 1570 Brossy, in spite of his obvious faults, is a loving father who has much to offer his children. There are many visits which have been enjoyable for the children. Totally cutting off visitation would deprive the children of an important part of their lives and would not be justified.
Mr. Rubin gave serious consideration to a transfer of the two youngest children to the father, while leaving the two oldest with the mother. However, he rejected this proposal because he felt it might complicate the visitation situation. Also, considering the two youngest children's attachment to their mother, he felt it would not be realistic to remove them from that environment.
The option to be adopted by this court ( an option not advocated by anyone ) is to adjust the visitation schedule to reduce, but not eliminate, the visits of the two older children but to reaffirm the visitation of the younger children with some modifications. The parties were right when they established the present parenting plan — Mrs. Wright should be the residential parent and Mr. Brossy should have visitation. It is the failure to enforce this general plan which has been the problem. Whether the court has the capacity to enforce visitation where children are resistant is unclear. But, throwing out the only sensible parenting plan because the court has not been able to enforce it would lead to parenting plans which are even worse and would have enforcement problems which are as bad or worse. Better to redouble efforts to enforce the existing plan. These efforts would include incarceration if either party fails to abide by court orders. No one involved in the case has really believed that the court would incarcerate one or both of the parties for failure to abide by court orders. However, if the court finds that the parties are wilfully violating the orders of the court there should be no reason why incarceration should be rejected as an enforcement tool.
In connection with the defendant's motion to modify custody dated January 19, 2000 (# 367) and the plaintiff's motion to modify visitation dated February 22, 2000 (# 339) the court finds that the following orders are in the best interests of the minor children.
1. The existing order for joint legal custody is affirmed except that Mrs. Wright shall be the sole decision maker on matters relating to summer camp for the children. However, the children shall not attend summer camp when they are scheduled to be with Mr. Brossy. Also, Mr. Brossy shall have no responsibility to pay for any summer camp scheduled by Mrs. Wright. Although the parties have shown no ability to make legal custody work, it is better to keep it in place as a way of forcing the parents to talk to each other about parental issues. However, the scheduling of summer camp has been the source of such intense conflict CT Page 1571 between the parties that control of this issue will be given to Mrs. Wright in the hope that it will ease some of the scheduling problems. If Mrs. Wright wants the children to go to summer camp she can schedule it on her time and pay for it herself.
2. The children's primary residence shall be with Mrs. Wright. Mr. Brossy shall have parental access with the children as follows:
Mr. Brossy shall have overnight access to his two older children, Victoria and Elizabeth, one weekend per month. This weekend shall begin on the fourth Friday of each month. Mrs. Wright or her designee shall transport Victoria and Elizabeth to Mr. Brossy's home in New Canaan on Friday evening so that they arrive no later than 5:30 p.m. Mr. Brossy or his designee shall transport Victoria and Elizabeth to Mrs. Wright's Simsbury home on Sunday evening so that they arrive no later than 5:30 p.m.
Mr. Brossy shall have overnight visitation with his two younger children, Caroline and William, twice per month. These weekends shall begin on the second and fourth Fridays of the month. Mrs. Wright or her designee shall transport Caroline and William to Mr. Brossy's home in New Canaan on Friday evening so that they arrive no later than 5:30 p.m. Mr. Brossy or his designee shall transport Caroline and William to Mrs. Wright's Simsbury home on Sunday evening so that they arrive no later than 5:30 p.m.
In addition, Mr. Brossy shall have uninterrupted access to all four of his children for two weeks in the summer. These weeks shall be the first and second full weeks in August. Mrs. Wright or her designee shall transport the children to Mr. Brossy's home in New Canaan on Friday evening so that they arrive no later than 5:30 p.m. of the Friday preceding the first full week in August. Mr. Brossy or his designee shall transport the children to Mrs. Wright's Simsbury home on Sunday of the second full week in August so that they arrive no later than 5:30 p.m.
The balance of the holiday and vacation schedule set forth on pages 5, 6 and 7 of the Stipulation of the Parties dated November 2, 1998 is affirmed.
During his parental access Mr. Brossy is to use no physical force with his children of any kind. The use of any physical force, even if not abusive of physically harmful will be considered to be in violation of this order. This order will be enforced with the full power of contempt including incarceration.
It is the expectation of the court that Mr. Brossy's parental access CT Page 1572 shall take place as scheduled above. It shall be Mrs. Wright's responsibility to deliver the children as scheduled. The children are not old enough or mature enough to decide for themselves whether to see their father at the scheduled times. It shall be the responsibility of Mrs. Wright to teach the children to respect their father and the orders of the court. If the children are not delivered as scheduled, the court will hold Mrs. Wright responsible, and will not hesitate to enforce the orders for parental access with all available powers of contempt of court including incarceration.
The Guardian Ad Litem and the attorney for the minor children are to meet with the children as soon as possible. They are instructed to explain this decision to them and to discuss with the children their responsibility to obey the orders of the court as well as the possible consequences to both parents if the orders of the court are not carried out.
3. No action is taken on Mr. Brossy's motions for contempt dated February 13, 2000 (# 336), March 5, 2000 (# 341 ) and March 20, 2000 (# 342 ) because they were previously acted on by the court on March 30, 2000.
4. The defendant's motion for contempt dated June 27, 2000 (# 351) is granted. Between March 27, 2000 and June 27, 2000 one or more of the children were withheld from visitation by Mrs. Wright. Most egregious, Victoria and Elizabeth were not delivered for visitation for visitation on the April vacation trip to the Grand Canyon. Mrs. Wright offered no credible defense. These violations are found to be wilful. As a penalty, Mrs. Wright will give Mr. Brossy a credit of $2500 on the bills of both the Guardian Ad Litem and the attorney for the minor children for a total credit of $5000. In addition, Mrs. Wright is ordered to pay Mr. Brossy the sum of $800 within 30 days as compensation for the nonrefundable airline tickets which he purchased for Victoria and Elizabeth.
5. The defendant's motions for contempt dated June 27, 2000 (# 352 ) and June 28, 2000 (# 360) are identical. Both are denied. The evidence is insufficient to demonstrate that Mrs. Wright acted in wilful violation of a specific court order by withdrawing the children from treatment by Dr. Anne Phillips (although it certainly violated the spirit of the stipulation of the parties).
6. The defendant's motion for contempt dated July 28, 2000 (# 359) is denied. Mrs. Wright was aware of Mr. Wright's letter to Robert W. Heagney before it was mailed. She implicitly endorsed that letter. This letter would have been in violation of an earlier court order but is not technically a violation of the existing order of November 2, 1998 CT Page 1573 (although it certainly is a violation of the spirit that order). The current order of November 2, 1998 only prohibits contacts to DCF and the police.
7. The plaintiff's motion for contempt dated February 22, 2000 (# 338 ) is granted. Mr. Brossy failed to comply with the November 2, 1998 order of the court that the parties participate in psychotherapy to explore the issues identified in Dr. Robson's report. Dr. Robson identified two issues with Mr. Brossy's parenting: his temper and his continued use of physical punishment with the minor children. This failure to comply is wilful. As a penalty, Mr. Brossy will give Mrs. Wright a credit of $2500 on the bills of the Guardian Ad Litem and the attorney for the minor children for a total credit of $5000. The court is aware of the limitations imposed by the recent decision in Janik v. Janik,61 Conn. App. 175 (2000). However, Mr. Brossy agreed to participate in psychotherapy and did not take an appeal when the court approved the stipulation. Further, the court considers Mr. Brossy to be in continued violation of his stipulation and will consider further reductions in his access to the children unless he performs his agreement to participate in psychotherapy and proves that it is taking place with appropriate documentation to the court from the psychotherapist specifically noting that the subject of the therapy is anger management. The therapist must be provided with a copy of this decision.
8. The Guardian Ad Litem and the attorney for the minor children shall jointly select an appropriate therapist or therapists for the four minor children. It would be preferable, but not necessary, that the children all see the same therapist. The children shall each see this therapist weekly until further order of the court. The therapist or therapists selected shall be ones who are covered under available health insurance. The parties shall each pay one-half of any therapy bill not covered by insurance.
9. The parties shall each pay one-half of the fees and costs of Attorney Ann Coonley, attorney for the minor children, the total of which is $37,830.60 from the commencement of her service. After giving Mrs. Wright credit for prior payments of $1,850.00, Mrs. Wright owes $17,065.00 which she is ordered to pay to Attorney Coonley within 90 days. After giving Mr. Brossy credit for prior credits of $8,290.00, Mr. Brossy owes Atty. Coonley $10,625.00 which he is ordered to pay within 90 days. Any additional fees arising out of the performance of this order shall be shared equally by the parties. The penalties set forth in 4 and 7 above cancel each other.
10. The parties shall each pay one-half of the fees and costs of Attorney Michael Perzin, Guardian Ad Litem, the total of which is CT Page 1574 $54,149.86 from the commencement of his service. After giving Mrs. Wright credit for prior payments of $2,120.00, Mrs. Wright owes $24,955.00 which she is ordered to pay within 90 days. After giving Mr. Brossy credit for prior payments of $15,488.00, Mr. Brossy owes Attorney Perzin $11,586.00 which he is ordered to pay within 90 days. Any additional fees arising out of the performance of this order shall be shared equally by the parties. The penalties set forth in 4 and 7 above cancel each other.
11. Mr. Brossy shall be solely responsible for the fees and costs for the court appearances of Attorney Eliot Nerenberg and Dr. Kenneth Robson.
12. The terms of the stipulation and court order of November 2, 1998 which are not modified by this decision shall remain in full force and effect.
13. The Regional Family Trial Docket shall retain jurisdiction of this case until further order of the court.
JOHN W. PICKARD JUDGE OF THE SUPERIOR COURT